Foster A. MacEDWARD, Appellee,

v.

NORTHERN ELECTRIC CO.,
LTD., Appellant.

No. 728, Docket 77–7514.

United States Court of Appeals,
Second Circuit.

Argued March 9, 1978.

Decided March 19, 1979.

William H. Quinn, Pierson, Affolter & Wadhams, Burlington, Vt., for appellant.

Fred I. Parker, Langrock, Sperry, Parker & Stahl, Middlebury, Vt., for appellee.

Before WATERMAN and OAKES, Circuit Judges, and WYZANSKI, District Judge.[*]

OAKES, Circuit Judge:

Appellant, Northern Electric Co., Ltd., appeals from a judgment in this diversity action for appellee, Foster A. MacEdward,

[*] Of the District of Massachusetts, sitting by designation.

after a jury trial in the United States District Court for the District of Vermont before James S. Holden, Chief Judge. The jury awarded appellee damages of $34,600 as due on a contract of employment. We vacate the judgment below and remand the case for a new trial.

Appellee, MacEdward, left his job as a pilot with Air North, Inc., in Burlington, Vermont, to accept a position as Flight Director with appellant in Montreal, Quebec. Appellee began work with Northern Electric in early December 1973 pursuant to a written offer of employment of October 31, 1973. Appellee resigned from his position with Northern Electric on July 15, 1974, at the latter's request because of his alleged violations of Canadian aviation regulations. Appellee received his salary through September 15, 1974.

Suit was based on an alleged promise, not contained in the written offer of employment, of a minimum two-year contract of employment. The employer's answer raised as affirmative defenses, among others, the defenses that the Statute of Frauds barred recovery because the contract was not to be performed within one year; that appellee's employment was in any event terminable at will; or, in the alternative, that if the employment was for a fixed term, appellant had properly exercised its right to terminate the employment.

At trial, MacEdward's counsel attempted to elicit from his client testimony as to the oral representations upon which his suit was partially based. Objection was made on the ground that the contract "falls within the Vermont Statute of Frauds and cannot be shown unless it is in writing." Appellee's counsel urged that the oral contract was taken out of the Statute of Frauds first, by the doctrine of promissory estoppel based on MacEdward's change of position to his detriment, and second, because "a substantial portion of this [contract] would not fall within the Statute of Frauds [because it] could have occurred within the one-year period." The trial judge indicated that he would allow the testimony as "background material." MacEdward's counsel then stated further that it was his client's position that the letter (of October 31, presumably) did not constitute the whole contract. The "major substance" of the contract, counsel argued, "took place between Mr. Lobb [appellant's president] and Mr. MacEdward." The court thereupon allowed appellee's testimony as to the oral representations of John C. Lobb that Lobb would "take care of" a contract of employment for appellee for "two, three, or five years or at least a gentleman's agreement." Three relevant written exhibits were admitted: Exhibit A, the offer of employment of October 31, 1973; Exhibit B, dealing with payment of relocation expenses; [1] and Exhibit C, appellee's application for employment of December 12, 1973.[2]

1. Exhibit B, which explicitly related only to appellant's payment of appellee's moving expenses, contained the following clause: "If the termination of your employment is initiated by the Company, no repayment of this amount will be required *and the Company will not be responsible for any claims or damages resulting from such termination.*" Although the italicized language might be read to suggest an employment relationship terminable at will, we do not thus read it. We limit the disclaimer of liability only to claims for moving expenses because that is the context of the letter. If the clause were ambiguous, we would construe it against appellant which prepared the form. At a *minimum*, we would find that there was no mutual assent that the clause, buried in a letter about moving expenses, would create an employment contract terminable at will. Finally, as we discuss *infra* in text, there was testimony that discussions about a contract for a mini-

mum term continued after October 31, 1973, the date of Exhibit B, and thus would have modified *appellant's right to terminate at will* appellee's employment. Indeed, even Exhibit C, *infra* note 2, would have superseded this arrangement by requiring one month's notice to terminate. Northern Electric did in fact pay appellee an extra two months' salary.

2. Exhibit C provided:

It is understood and agreed that in the event of employment the length of notice to be given on either side to terminate the engagement shall be one hour, one day, one week, or one month, from the date of such notice, according as the rate of pay at the time of notice may be by the hour, day, week or month, as shown by the employee's rate card irrespective of any original rate. It is further understood and agreed that the length of no-

Neither party submitted requests to charge to the trial judge; instead, the court charged the jury on instructions without counsels' input and guidance. Pertinent portions of the charge to the jury on the contract generally are set forth in the margin.[3]

Northern Electric objected to the instructions (1) that it was not essential for a contract to be in writing, in one instrument, or signed by both parties; (2) that oral promises could be enforced if the jury found that the parties did not intend the promises to be in writing (counsel reminding the court of Northern Electric's position that any contract to be performed in excess of one year must be in writing); and (3) that characterized one party's leading another to believe a certain set of circumstances and the second party's reliance on the representations as the equivalent of a meeting of the minds. The trial judge answered the third objection (as to the characterization) by stating that his charge was a

tice required shall not be affected by the fact that the Company, as a matter of convenience, may at its option pay the employee's wages by the week or by some other period that may not correspond to the period of engagement, and in any case, neither party shall be required or obliged to give notice in excess of one month.
There was no evidence as to the rate of pay on appellee's rate card, so appellant would be bound to provide the maximum notice of one month. Appellant in fact paid appellee's salary for two months after requesting his resignation.

3. [I]t's not essential that a contract . . . be embodied in one written instrument, nor is it required that a binding contract . . . be signed by both parties or their authorized representatives.

.    .    .    .    .

[I]n many cases a written contract will not define all aspects of the agreement, even though the parties have considered particular items not discussed in the written documents and have actually reached some kind of an agreement not on written terms as well.
If you believe from the evidence that the agreement between the parties here was not intended to be contained only in an instrument signed by them, but rather consisted of both written and oral promises, then the oral portions of the agreement may be enforced and damages awarded for breach thereof just as though those portions had been contained and appeared in the written expression of the agreement as exhibited by the parties.
I caution you that a complete contract can only result where there is a meeting of the minds of the parties on each term. Whether that be in writing or oral. That is, the parties must agree to the same things at the same time.
If a provision of a contract is ambiguous, does not clearly define the rights of the parties, the law allows you to consider the circumstances surrounding the agreement at the time it was made and antecedent to that time in order to determine whether at the time of the agreement the parties had some mutual understanding which is not set forth precisely in the writings themselves and if one party to a contract leads the other to believe that a particular item is part of the agreement and that person should realize that the other party would reasonably have believed this to be the case, then this action on the part of the person who makes such a representation is the equivalent of a meeting of the minds, even if the parties did not actually and specifically share in this particular understanding.
The question is what the parties intended. To determine what the parties intended, you may consider the background of their undertaking. What facts and circumstances brought the two people together? What circumstances prevailed at the outset of their negotiations? What they said and what they wrote and what they did with reference to reaching a final agreement. As to this, of course, you may include Defendant's Exhibit "C", which was the plaintiff's application for employment. You may also consider the defendant's response to that application as is set forth in the Defendant's Exhibit "A", which was the Beauchamp letter of October 31st, 1973, and you may also consider the second letter of the same date that is set forth in Defendant's Exhibit "B".
The court further charged that if the jury found, as MacEdward contended, that Mr. Lobb agreed to give him a two, three, or five year contract but Northern Electric failed to specify the term, then the jury should hold the employer to the least favorable term of two years. The court charged Northern Electric's position of a contract terminable at will in reliance on Exhibit A and that if the jury found that the term of employment was indefinite when the plaintiff began work, the jury should consider "whether [sic] . . . the subsequent letter did not include actual length of the time of employment. You may consider whether this washed out any prior negotiations that might have been had regarding the length of time that the contract was to remain in force."

statement of the law in Vermont,[4] but he did not comment on the first two objections or supplement the original charge to the jury after the bench conference was concluded. The case thus went to the jury with no instructions on the defense of the Statute of Frauds or on the law of promissory estoppel.

Appellant's post-verdict motions were alternatively based on a lack of evidence to show an oral promise, the Statute of Frauds, portions of the charge claimed to be erroneous, and the verdict as being against the weight of the evidence. The trial court held, however, evidently as a matter of law, that there was sufficient evidence of an oral promise of employment for two, three, or five years and that the plaintiff's reliance on the promise constituted sufficient detriment to remove the bar of the Statute of Frauds. *See* note 4 *supra.* The court further held that its instructions were correct and that the evidence supported the jury's verdict.

Our first problem in reviewing the record on appeal is that we cannot say whether the jury correctly found, as it impliedly did by its verdict for the plaintiff, that appellant's president Lobb's oral promise to appellee of a contract for at least two years superseded the provision in Exhibit C, *supra* note 2, that the employment was terminable on not more than one month's notice. Part of the difficulty in ascertaining the meaning of the jury's verdict results from the jury instruction that subsequent dealings between the parties could "wash[ ] out any prior negotiations" and that the jury should consider Exhibit C, plaintiff's application for employment, and Exhibit A, defendant's response to that application, as evidence of what the parties intended. The instruction was correct as a matter of law but, unfortunately, not as a matter of fact. Exhibit A

is the offer of employment of October 31, 1973; Exhibit C, the application of December 12, 1973. Thus Exhibit A was not a response to the application as characterized below. The trial judge properly gave the jury the latitude to consider the effect on prior agreements of the subsequent dealings between the parties; but because this instruction confused what was prior with what was subsequent, we cannot tell which the jury found to have been superseded, that is, whether, by its verdict, the jury intended to give effect to the discussions or to the clause in Exhibit C that purported to make the employment terminable on one month's notice.

This ambiguity becomes crucial because the evidence left hanging unanswered whether the discussions between appellee and Lobb about the term of the contract continued after the December 12 application for employment, Exhibit C. Appellee clearly testified that discussions about obtaining a reciprocal pilot's license (according to the testimony, the other condition upon which MacEdward insisted) continued for five and a half months, but specificity about the timing of the contract negotiations is noticeably absent. Appellee did testify that subsequent to receiving the October 31 offer of employment, he was "continually talking with Mr. Lobb," but the testimony does not further indicate that the discussions were subsequent to the December 12 application also or to what they particularly referred. At the very moment when appellee's counsel could have clarified the record, appellant's counsel objected to the form of the question; and in the end appellee's counsel did not ask or receive an answer to the question whether appellee talked to Lobb about the contract after the December 12 application. Thus, although

---

4. It is difficult to tell whether the characterization referred to promissory estoppel or to the objective theory of contractual intent. If the latter, the court was clearly correct. If the former, the Vermont Supreme Court does view promissory estoppel favorably. *See Overlock v. Central Vermont Pub. Serv. Corp.,* 126 Vt. 549, 237 A.2d 356 (1967). To be sure, no case has specifically followed Restatement (Second)

of Contracts § 217A (Tent. Draft Nos. 1–7, 1973), *see* Comment b and Illustration 2, permitting avoidance of the Statute of Frauds through promissory reliance, but we have no reason to doubt that the Vermont Supreme Court would be likely to follow the Restatement; the Law Institute has always carried great weight with that great court.

the time frame is clearly "after October 31st," we are left to speculate whether it was after December 12 also. Upon an independent examination of the record, we are unwilling to hold as a matter of law that the contract negotiations superseded the clause in Exhibit C.

There is another, perhaps more serious, problem in reviewing this case. Appellant's answer raised the Statute of Frauds as an affirmative defense to the alleged oral promise for a contract of at least two years. Appellant's counsel objected on this same ground at the beginning of appellee's testimony about the discussions with Lobb and at other times in the trial as well as in the post-verdict motions. Appellee based his rebuttal at the time of the objection at trial on promissory estoppel, and the court indicated that it would allow the testimony as "background material." The trial judge did not specifically address the issues of the Statute of Frauds and estoppel again until his memorandum and order denying appellee's post-trial motions in which he appears to hold as a matter of law that appellee's reliance to his detriment on appellant's alleged promise of a contract for at least two years constituted a sufficient detriment to remove the bar of the Statute of Frauds.[5] We can assume that the court's denial of the motions for directed verdict represents implied findings that appellee had introduced sufficient evidence of reliance to raise a jury question about promissory estoppel.[6] But more than this we cannot assume. Because the court's instructions do not cover these key issues we cannot conclude that the verdict was properly rendered, even though no specific objection was made to the failure to charge on them.

A plaintiff who seeks to raise promissory estoppel in avoidance of the Statute of Frauds must prove sufficient reliance and detriment. The Restatement (Second) of Contracts § 217A(2) indicates five factors in the determination of whether in the interest of justice a defendant should be held to an oral promise notwithstanding the Statute of Frauds, two of which are particularly relevant here:

. . . . .

(b) the definite and substantial character of the action or forbearance in relation to the remedy sought; [and]

(c) the extent to which the action or forbearance corroborates evidence of the making and terms of the promise, or the making and terms are otherwise established by clear and convincing evidence . . . .[7]

The court's charge to the jury on "representations" and "reliance," however, seems to reflect the doctrine of contract formation more than promissory estoppel. The instruction omits adequately to present the issues of "definite and substantial" reliance and proof of the terms of the promise by "clear and convincing evidence." Indeed, the charge did not assign to the plaintiff the burden of proof of reliance and detriment. Thus the jury's verdict cannot be clearly ascertained.[8]

Accordingly, we vacate the judgment below and remand the case for a new trial. We recognize that neither party complained on appeal of the charge to the jury; and in the ordinary course of appellate review we might not reach the issue. But an appellate court has the power to notice fun-

---

5. *MacEdward v. Northern Electric Co.,* No. 75 Civ. 137 (D.Vt. Sept. 21, 1977).

6. *See* note 4 *supra.*

7. The other three factors that the Restatement suggests are:
    (a) the availability and adequacy of other remedies, particularly cancellation and restitution;
    . . . . .
    (d) the reasonableness of the action or forbearance;

(e) the extent to which the action or forbearance was foreseeable by the promisor.

8. Nor can we hold as a matter of law that appellee's proof of reliance was insufficient to permit the case to go to the jury. There was evidence that he left a long-continued employment, took certain refresher training to continue his qualification to fly the Northern Electric plane, and incurred certain housing and traveling expense tending to offset the better pay received than in his former employment.

damental errors at trial even if the parties do not raise them on appeal. *See, e. g., McDougall v. Dunn,* 468 F.2d 468, 476 (4th Cir. 1972); *Atlantic Coast Line Railroad Co. v. Kammerer,* 205 F.2d 525, 526 (5th Cir. 1953) (dicta); *Keeshin Motor Express Co. v. Glassman,* 219 Ind. 538, 38 N.E.2d 847, 854–55 (1942); *Johnson v. Parsons,* 153 Me. 103, 135 A.2d 273, 277 (1957); *Schmitt v. City of Philadelphia,* 248 Pa. 124, 93 A. 879 (1915). *See also San Antonio v. Timko,* 368 F.2d 983 (2d Cir. 1966) (Friendly, J.) (weakness of the evidence is important to characterization of error as "fundamental error" and propriety of reversal of judgment below), in which it does not appear whether appellant raised on appeal the ground upon which the court of appeals reversed the judgment below. The standard is reversal for "fundamental error"; and it is "fundamental" that the charge cover the basic elements of an asserted claim or defense when, as here, the facts are in dispute. *Frederic P. Wiedersum Associates v. National Homes Construction Corp.,* 540 F.2d 62, 66 (2d Cir. 1976). *Accord, Choy v. Bouchelle,* 436 F.2d 319, 325 (3d Cir. 1970) (charge of court reviewed as plain error omitting to provide legal guidelines to the relevant factual situations).

So too a case may be remanded where an inadequate record prevents the appellate court from conducting an intelligent review. *See, e. g., Jelfo v. Hickok Manufacturing Co.,* 531 F.2d 680, 681 (2d Cir. 1976); *McCune v. Frank,* 521 F.2d 1152 (2d Cir. 1975). *See also Coopers & Lybrand v. Livesay,* 437 U.S. 463, 98 S.Ct. 2454, 2461, 57 L.Ed.2d 351 (1978). Finally, we note that where the record contains no direct evidence on a determinative issue, it is possible that "on [that] record, neither party is entitled to prevail. If the issue . . . [is] determinative, a new trial should have been ordered so that this issue might have been resolved in the light of a full examination of . . . the witness who could have given further testimony on the subject." *Stewart v. Southern Railway Co.,* 315 U.S. 283, 286, 62 S.Ct. 616, 617, 86 L.Ed. 849 (1942). Where, as in this case, "[t]he jury may not only have been deprived of the best evidence, but it may have been confused by what was introduced[,] [t]here is, therefore, a substantial question as to whether there has been a 'just . . . determination of [this] action.' Fed.R. Civ.P. 1. Under these circumstances a new trial is appropriate." *Samuels v. Health & Hospitals Corp.,* 591 F.2d 195, 199 (2d Cir. 1979).

Judgment reversed and cause remanded for a new trial.

WATERMAN, Circuit Judge, dissenting:

I respectfully dissent from the result reached by my colleagues. I would reverse the judgment below and order that judgment be entered for the defendant. The sole contention the parties have presented to us upon this appeal is whether the district court erred in failing to grant the defendant-appellant's motions for a directed verdict or for judgment notwithstanding the verdict. The question of whether the trial court's charge to the jury was so prejudicial that the case ought to be retried was not raised as error by either of the parties; it was not argued in the appellate briefs; and, indeed, it was not preserved for appellate review at the trial court level. Despite this, my colleagues have chosen not to address the issue of the sufficiency of the evidence below to sustain the verdict but instead have remanded the case for retrial on the ground that erroneous instructions were given to the trial jury. I cannot agree with this disposition of the case. I believe that we should adjudicate the issue the parties asked us to adjudicate, that of whether there was enough evidence before the jury to support the refusals to grant defendant's motions, and certainly we should do so here where such an adjudication could result in a final termination of the litigation. Of course, when adjudication upon the issue the parties raise could terminate the litigation, adjudication upon that issue should have priority over other issues which could require a new trial. Here it is my belief that any error in the court's instructions to the jury has no bearing upon the determination as to whether

there was sufficient evidence to sustain the jury's verdict. *Johnson v. United States,* 434 F.2d 340 (8th Cir. 1970); *Myra Foundation v. United States,* 267 F.2d 612 (8th Cir. 1959); *Coca-Cola Bottling Company of Black Hills et al. v. Hubbard,* 203 F.2d 859 (8th Cir. 1953). *Accord, Scola v. Boat Frances R., Inc.,* 546 F.2d 459, 460 (1st Cir. 1976); *Gorsalitz v. Olin Mathieson Chemical Corp.,* 429 F.2d 1033, 1040, n. 5 (5th Cir. 1970), *cert. denied,* 407 U.S. 921, 92 S.Ct. 2463, 32 L.Ed.2d 807, *reh. den.,* 409 U.S. 899, 93 S.Ct. 108, 34 L.Ed.2d 159 (1972).

Should the district court have granted the defendant's motion for a directed verdict, or its motion made after verdict for judgment n. o. v.?

Examining the evidence in the record in the most favorable light for appellee, perhaps there was evidence sufficient to allow a reasonable inference that further discussions between MacEdward and Lobb as to the term of the employment contract superseded the Exhibit C application form language, the application MacEdward signed on December 12, 1973. MacEdward testified that "at various times" and "on many occasions," Transcript (hereinafter "Tr.") 29, 30, he raised with Lobb the thought that he would like a contract for a specific term of years, and that each time the response was that Lobb would personally take care of it. Tr. 30. At no time did Lobb say anything to the contrary. Tr. 29, 30. MacEdward had the opportunity to speak to Lobb about this desire on any number of occasions following December 12, 1973, Tr. 37, 38, 41, 42; and, in view of his testimony that, as of February 1974, he was "still pushing for . . . a contract, this was continuous all the time," Tr. 156, it is reasonable to infer that he utilized those opportunities so to speak.

Thus, there may have been enough evidence to permit the case to go to the jury on the factual issue of whether the parties entered into an oral contract of employment for a specific term of years. Nevertheless, assuming this to be so, I cannot find sufficient evidence to permit the case to go to the jury on the factual issue of whether

there existed the necessary elements of promissory estoppel to remove the bar of the Statute of Frauds to the enforcement of such a putative oral contract.

I agree with my colleagues that the Vermont Supreme Court would be likely to follow the Restatement of the Law of Contracts in a case such as this, were the American Law Institute finally to adopt the tentatively drafted Section 217A. However, I cannot subscribe to a belief that the court would, in applying that section, find that the facts here are sufficient to estop this defendant from effectively interposing the Statute of Frauds as a defense to plaintiff's action.

The Vermont Supreme Court thus far has never addressed the issue of whether the doctrine of promissory estoppel may be used so as to bar the defense of the Statute of Frauds in contract actions. While the Supreme Court of Vermont in *Overlock v. Central Vermont Public Service Corp.,* 126 Vt. 549, 237 A.2d 356 (1967), appears to have adopted in dicta the principles of promissory estoppel as those are set forth in Section 90 of the Restatement of Contracts, the *Overlock* case concerned the use of promissory estoppel as a substitute for a missing element of consideration in contract formation and did not concern its use to overrule the defense of the Statute of Frauds.

True, in those cases in which the court has discussed the Statute of Frauds, the court has allowed principles of equitable estoppel and the closely related doctrine of part performance to mitigate the harsh inequities that would result from a mechanical application of the Statute. *Towsley v. Champlain Oil Co.,* 127 Vt. 541, 254 A.2d 440 (1969); *Cooley v. Hatch,* 97 Vt. 484, 124 A. 589 (1924); *Taplin v. Hinckley Fibre Co.,* 97 Vt. 184, 122 A. 426 (1923). But, I point out that before doing so, the court has implicitly bound the plaintiff in each case "to introduce evidence supporting the proposition that insistence on the requirements of the Statute of Frauds would, in effect, be using the Statute to promote, rather than prevent, a fraud." *Towsley v. Champlain Oil Co., supra,* 127 Vt. at 543, 254 A.2d at 442.

This limitation upon the exercise of equitable powers to estop the application of the Statute of Frauds is the traditional limitation, and has not been abandoned by those courts which permit the use of the doctrine of promissory estoppel to bar the interposition of the Statute of Frauds as a defense.

In looking at the history of this doctrine, one will find that, practically speaking, courts had adopted the underlying principles of the doctrine of promissory estoppel long before Section 217A was drafted by the American Law Institute. The traditional element of equitable estoppel which required a misrepresentation or concealment of material fact at the inception of the agreement had already been abandoned. Thus, rather than requiring the plaintiff seeking enforcement of an agreement within the Statute to demonstrate a fraudulent intent on the part of the promisor, some courts had held that it was sufficient for the application of equitable estoppel by a plaintiff if a fraudulent *effect* would follow if a defendant should set up a defense inconsistent with his former declarations and the plaintiff had reasonably relied on those declarations. *See Seymour v. Oelrichs,* 156 Cal. 782, 106 P. 88 (1909); 28 Am.Jur.2d, *Estoppel & Waiver* §§ 48, 49; 73 Am.Jur.2d, *Statute of Frauds* § 562; Annot., 56 A.L.R.3d 1037 (1974), Annot., 54 A.L.R.3d 715, 724 (1973).

Quite clearly, the evidence here fails to demonstrate either that the appellant possessed a fraudulent intent at the inception of the agreement or that a successful defense to plaintiff's action on the basis of the Statute of Frauds would have an effect upon plaintiff that would amount to the perpetration of a fraud upon him.

This consideration of whether the enforcement of the provisions of the Statute of Frauds will result in the promotion of fraud and injustice marks the point of counterbalance between the doctrine of equitable estoppel and the Statute of Frauds; it is a limitation upon equitable powers that is implicit in the history and development of the doctrine of equitable estoppel in this context.

The Statute of Frauds was first enacted in 1677. Entitled a "Statute for the Prevention of Frauds and Perjuries," the Statute, as stated in its preamble, was aimed at "many fraudulent practices which are commonly endeavored to be upheld by perjury and subornation of perjury." 29 Car. 2, C.3 (1677). It soon became apparent, however, that "its strict interpretation and literal application frequently resulted in a successful consummation of fraud and injustice." 2A Corbin, *Contracts,* 28 at n.23. Concerned that the Statute not become a refuge for contract-breakers, the courts of chancery set about carving out exceptions to its application with a view toward obtaining the chief purpose of the Statute. Thus, the development of the doctrine of equitable estoppel and the enforcement of the Statute of Frauds have occurred simultaneously, counterbalancing each other, each with an aim toward preventing fraud and injustice. As Professor Williston has stated: "The Statute was designed as the weapon of the written law to prevent frauds; the doctrine of estoppel is that of the unwritten law to prevent a like evil." 3 *Williston on Contracts* § 533A, 798 at n.27 (3d ed. W. Jaeger 1972).

Accordingly, the courts in applying the principles of equitable estoppel have been at the same time ever vigilant to prevent the extension of this exception to the enforcement of the provisions of the Statute of Frauds beyond its strict bounds lest extensions of the exception swallow up the rule and purpose of the Statute and thus amount to a judicial nullification of the legislative will, a will constantly evidenced by the continued legislative enactment of the Statute.

The drafters of Section 217A have affirmed this historical balance between the Statute and the equitable exception to its use. That section provisionally and tentatively reads as follows:

§ 217A. Enforcement by Virtue of Action in Reliance

(1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the prom-

isee or a third person and which does induce the action or forbearance is enforceable notwithstanding the Statute of Frauds *if injustice can be avoided only by enforcement of the promise.* The remedy granted for breach is to be limited as justice requires. (emphasis added). ALI Restatement (Second) of Contracts, Tentative Drafts Nos. 1–7 (rev. & ed. 1973).

Section 217A goes on to list those factors which are significant in determining whether only by enforcement of the promise can injustice be avoided. It is instructive to note of those factors the two most pertinent to our case: "(b) the definite and substantial character of the action or forbearance in relation to the remedy sought; (c) the extent to which the action or forbearance corroborates evidence of the making and terms of the promise, or the making and terms are otherwise established by clear and convincing evidence."

With these factors in mind, I note that MacEdward places great emphasis upon the relinquishment of his employment with Air North, with the loss of his seniority, pension rights, privilege of reduced air fare, and the personal use of aircraft which his resignation entailed; and accords much significance to his attainment of landed immigrant status with the Canadian government.

His evidence, however, does not disclose the nature and details of his pension and seniority rights. Too, there is nothing in the record to indicate that obtaining this landed immigrant status involved any burden or detriment—financial or otherwise— to MacEdward. As for the personal use of Mr. Deeds' aircraft, MacEdward conceded on cross-examination that this privilege was not a part of his employment relationship with Mr. Deeds but, rather, grew out of a personal friendship between himself and Deeds. Tr. at 121.

This evidence is inadequate to overcome the provisions of the Statute. The relinquishment of one's prior employment, standing alone, has never been an adequate detriment or a sufficient reliance to remove the bar of the Statute of Frauds. Indeed,

were it otherwise, the bar of the Statute would only be applicable when the plaintiff-employee had been previously unemployed. The appellee has shown precious little beyond the giving up of his employment with Air North. There is nothing to indicate that his prior employment with Air North was anything other than one terminable at will. Moreover, upon accepting employment with appellant he did not relocate his family to Montreal but chose instead to commute between Middlebury, Vermont, and Montreal, and there is no evidence of the costs of the travel and housing expenses incurred by him as a result of his commuting.

The evidence of detriment suffered by MacEdward as a result of his claim of reliance on Lobb's assurances of a two-year contract does not rise to the level of the detrimental reliance required in other cases to remove the bar of the Statute. There was no relocation to a distant city, *Lucas v. Whittaker,* 470 F.2d 326 (10th Cir. 1972); *Montgomery v. Moreland,* 205 F.2d 865 (9th Cir. 1953); *Fibreboard Products, Inc. v. Townsend,* 202 F.2d 180 (9th Cir. 1953); *Alaska Airlines v. Stephenson,* 217 F.2d 295, 15 Alaska 272 (9th Cir. 1954); MacEdward was not placed temporarily in an inferior job at a reduced rate of pay, *Fibreboard Products, Inc. v. Townsend, supra;* he did not relinquish valuable retirement benefits, *Pursell v. Wolverine-Pentronix, Inc.,* 44 Mich.App. 416, 205 N.W.2d 504 (1973); he did not give up a secure, tenured position of employment, *Seymour v. Oelrichs, supra; Alaska Airlines v. Stephenson, supra,* or a substantial financial or business investment, *St. Louis Trading Co. v. Barr,* 168 Okl. 184, 32 P.2d 293 (1934).

As to the factors in subsection (c) of Section 217A, I point out that while there probably was evidence sufficient to allow the case to be submitted to the jury on the question of whether there was any alleged contract arrived at for any definite term, such evidence was minimal indeed. At MacEdward's first October meeting with Lobb, MacEdward demanded as a condition of employment that he be granted a "sub-

stantial contract," a "contract for two, three or five years," or a "gentleman's agreement." Tr. 28, 29. It is fair to say that MacEdward's proposals at this point were anything but well-defined ones. Furthermore, it is clear that these proposals were advanced at what was essentially a preliminary negotiating session only. MacEdward then testified that his subsequent discussions with Lobb were less specific in nature, Tr. 96, and that there were no further detailed employment discussions after his submission of the December 12 application form. Tr. 155.

In contrast to this, Lobb adamantly denied ever promising MacEdward any specified term of employment, stating: "There's no possibility [that I made such a promise] because we have no contracts in the company, even for officers of the company." Tr. 162–63. Other employees of Northern Electric also testified that no contracts for a definite term were ever granted by the corporation.

Thus, it can hardly be said that there was clear and convincing evidence of the existence of a two-year contract. Nor do the circumstances surrounding MacEdward's acceptance of the job otherwise corroborate the making of such a contract. Rather, to my mind, they are probative of little more than the fact of his being hired by Northern Electric. MacEdward did what thousands of Americans do each year in our upwardly mobile society. He left a steady job for a better paying job of greater responsibility. My colleagues in holding that the relinquishment of prior employment under these circumstances is sufficient to prevent the interposition of the Statute of Frauds as a defense to the enforcement of an unwritten contract repeal the Statute and nullify the legislative intent constantly evidenced by its continued enactment.

Vermont first adopted its Statute of Frauds in 1822, and very recently its policy has been extended to include new classes of cases. 1975 Vt. Acts (adj. sess.), Pub.L.No. 250, § 1 (1976), 12 Vt.Stat.Ann. tit. 12 § 181(6) and (7). This can therefore fairly be said to reflect a continuing and present declaration of legislative public policy to endorse the Statute and to further its purposes.

The particular section of the Statute of Frauds with which we are dealing "grew out of a purpose to intercept the frequency and success of actions based on nothing more than loose, verbal statements or mere innuendos." 72 Am.Jur.2d, *Statute of Frauds,* § 7. Our case presents precisely that sort of situation.

Accordingly, as stated by me earlier, I would reverse the judgment below and order that upon remand entry of judgment for the defendant be entered. In so doing, I am not unmindful of the fact that a Court of Appeals, in reversing a district court's denial of a motion for judgment n. o. v., has the discretionary power which the district court has to order a retrial rather than to direct the entry of judgment for the moving party. F.R.Civ.P. 50(d), 28 U.S.C.; 5A Moore, *Federal Practice,* ¶ 50.15; 9 Wright & Miller, *Federal Practice & Procedure,* § 2540. *See also, Neely v. Martin K. Eby Construction Co.,* 386 U.S. 317, 87 S.Ct. 1072, 18 L.Ed.2d 75 *reh. den.,* 386 U.S. 1027, 87 S.Ct. 1366, 18 L.Ed.2d 471 (1967). However, a review of those cases in which the district and appellate courts have dealt with this question convinces me that cases in which a court exercises this discretion and, though judgment might have been ordered, directs a new trial, are rare, and appear to be limited to those instances wherein the appellee has demonstrated the possibility of a cure on remand of defects in proof occasioned through no fault of his own, or where, similarly, the appellee was handicapped in the full development of the evidence at trial. *See Samuels v. Health & Hospitals Corp.,* 591 F.2d 195, 199 (2d Cir. 1979) (new trial; "all parties were at a disadvantage in investigation and preparing for trial"); *Proctor & Gamble Defense Corp. v. Bean,* 146 F.2d 598, 601 (5th Cir. 1945) (new trial; "evident confusion" as to pleadings and admissions); *Mercer v. New York Trap Rock Corp.,* 91 F.Supp. 434, 438 (E.D.N.Y.1950) (new trial; "death case and the plaintiff was obviously at a disadvan-

tage in the preparation of her case"); *cf. Ferrell v. Trailmobile, Inc.,* 223 F.2d 697 (5th Cir. 1955) (newly discovered evidence which amounts to a conclusive demonstration of appellee's nonliability requires a new trial, although proper diligence was not used to secure evidence at trial). *See also Geller v. New England Industries, Inc.,* 535 F.2d 1381 (2d Cir. 1976) (judgment n. o. v. reversed; new trial in interests of justice partially due to confusion of parties).

The appellee here should not get a new trial. He had a fair and reasonable opportunity at trial to develop fully all issues of law and of fact. His counsel demonstrated early in the case an understanding of the principles of promissory estoppel in his colloquy with Judge Holden, Tr. 27, and in effectively eliciting information to support his client's claims through the examination of the witnesses. The interests of justice require, to my mind, not the granting to plaintiff of a second chance in order to fill any gaps in his case, but a final termination of this litigation. I find the present case quite similar to that of *Neely v. Martin K. Eby Construction Co., supra,* wherein the U. S. Supreme Court upheld the court of appeals' reversal of a denial of a motion for judgment n. o. v. and order of entry of judgment below for the appellant. As in *Neely v. Martin K. Eby Construction Co., supra,* the appellee here has suggested no grounds for a new trial and does not claim error in the trial. Appellee did not object to the instructions given by Chief Judge Holden when given in the district court, and made none to us on appeal. In fact, neither the appellee nor the appellant, in the submission to us of the portions of the trial record they deemed pertinent, included a transcript of the court's charge, the charge which my brothers find so erroneous that they believe the case should be retried.

In seizing, sua sponte, as justification for a grant of a new trial, the ground that an unclear charge was given to the jury, my brothers completely disregard the existence of Rule 51 F.R.Civ.P., 28 U.S.C. Rule 51 states:

No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection.

Here the parties made no pertinent objection before the jury retired and, of course, did not assign as error any inadequacies in the charge as given or, indeed, submit the charge to us for our inspection. Yet, regardless of this, a new trial is being ordered in complete disregard of the purpose of Rule 51.

As is stated in *Troupe v. Chicago, D. & G. Bay Transit Co.,* 234 F.2d 253, 259–60 (2d Cir. 1956), often quoted:

The purpose of this salutary rule is to expedite the administration of justice by insuring that the trial judge is informed of possible errors so that he may have an opportunity to reconsider his charge, and, if necessary, to correct it.

Here, neither of the parties objected to Judge Holden's inadvertent confusion of Exhibits A and C nor was there any objection to the failure to instruct the jury as to the defense of the Statute of Frauds. Had objections been made, it is extremely likely that Judge Holden would have corrected these errors. As no objections were taken, fairness to the district court and to the litigants requires that these errors not be made the grounds for a reversal of the judgment below. *Palmer v. Hoffman,* 318 U.S. 109, 119, 63 S.Ct. 477, 87 L.Ed. 645 (1943); *United States v. Atkinson,* 297 U.S. 157, 56 S.Ct. 391, 80 L.Ed. 555 (1936); *Westerman v. Sears, Roebuck & Co.,* 577 F.2d 873, 882 (5th Cir. 1978) (appellant pleaded "misuse" as an affirmative defense but its requests and objections were limited to misuse as a proximate cause of injury; hence appellant's contention that the trial judge erred in not instructing on "misuse" as affirmative defense could not be considered); *Cohen v. Franchard,* 478 F.2d 115 (2d Cir.), *cert. denied,* 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 106 (1973); *McNamara v. Dionne,* 298 F.2d 352 (2d Cir. 1962); *Alexander v. Kramer,* 273 F.2d 373, 375 (2d Cir. 1959); 5

**116**

Moore, *Federal Practice* ¶ 51.03; 9 Wright & Miller, *Federal Practice & Procedure,* § 2558.

The case at bar simply does not present any factors warranting the exceptional use of the plain error doctrine. The instructions are not "totally contradictory and inconsistent," *Frederic P. Wiedersum Assoc. v. Nat. Homes Const.,* 540 F.2d 62, 66 (2d Cir. 1976), nor are they so confusing as to fail "to provide even the barest legal guideposts to aid the jury in rationally reaching a decision." *McNello v. John B. Kelly, Inc.,* 283 F.2d 96, 102 (2d Cir. 1960) ("The question of liability . . . was submitted to the jury with what was tantamount to no instructions at all"). *See also Johnson v. Erie Railroad Company,* 236 F.2d 352 (2d Cir. 1956).

While Judge Holden's instruction as to the legal significance of Exhibits A and C was confusing, the clear import of his instruction was that subsequent dealings could supersede prior agreements. This is an easily understood concept, and we must assume that the jury had access during the course of its deliberations to the exhibits which were clearly marked, were readily identifiable, and which bore the correct dates. In light of this, Judge Holden's mistaken identification was harmless.

The remaining portions of the instructions were correct insofar as they went. Judge Holden's instructions on reliance were unquestionably meant to reflect the objective theory of contractual intent, placed as they were in the middle of a paragraph dealing with determining the contractual intent of the parties. *Cf. Jordon v. Dyer,* 34 Vt. 104 (1861) (whatever is expected by one party to a contract and known to be so expected by the other is deemed to be a part or condition of the contract).

Nor were the other instructions improper, as their clear intendment was to inform the jury that a contract may consist of several different writings and need only be signed by the party to be charged, which is not inconsistent with the requirements of the Statute of Frauds, *Ide v. Stanton,* 15 Vt.

685 (1843); 37 C.J.S. *Frauds, Statute of* § 206, and to convey the concept of the integrated versus the nonintegrated written contract. X *Wigmore on Evidence,* 3d ed., §§ 2429–31; 32A C.J.S. *Evidence* § 1013(1).

I submit that an issue which was not properly raised at trial or presented on appeal should not provide a predicate for reversing the court below. I respectfully dissent from the remand ordering that a new trial be granted.